**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| PAULA WENDLAND, Derivatively on Behalf of AMEDISYS, INC., | ) Civil Action No. |
| | ) |
| | ) **VERIFIED SHAREHOLDER** |
| Plaintiff, | ) **DERIVATIVE COMPLAINT** |
| v. | ) |
| | ) |
| WILLIAM F. BORNE, DALE E. REDMAN, JEFFREY D. JETER, RONALD A. LABORDE, JAKE L. NETTERVILLE, DAVID R. PITTS, PETER F. RICCHIUTI , and DONALD A. WASHBURN, | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| | ) |
| Defendants, | ) |
| | ) |
| -and- | ) |
| | ) |
| AMEDISYS, INC., a Delaware corporation, | ) |
| | ) **JURY TRIAL DEMANDED** |
| Nominal Defendant. | ) |
| | ) |

1.     Shareholder Paula Wendland files this derivative action against the officers and directors of Amedisys, Inc. ("Amedisys" or the "Company") on behalf of Amedisys. This action seeks to remedy defendants' violations of law, including breaches of fiduciary duties, unjust enrichment, and waste of corporate assets that have caused substantial losses to the Company and other damages, such as to its reputation and goodwill.

2.     Amedisys provides home health and hospice services to the most vulnerable of America's society. The Company's typical patient is Medicare eligible, approximately 83 years old, takes approximately 12 different medications on a daily basis and has co-morbidities. Its hospice agencies provide palliative treatment to the terminally ill. This action arises out of a betrayal of the trust placed in those that control Amedisys to ethically care for those that cannot help themselves.

3.     Medicare payments are critical to Amedisys's business. Nearly 90% of the Company's revenue comes from providing services that are covered and paid for by Medicare. The Company's fees are set by the Centers for Medicare & Medicaid Services ("CMS") through its home health prospective payment program ("PPS"). Under PPS, Medicare paid certain additional amounts when patient care reached certain benchmarks. For instance, from 2000 to 2007, Medicare would provide a flat fee of $2,200 for up to nine home therapy visits, and an additional $2,200 upon the tenth visit. For at least the past 4 years, with the approval of the Company's senior officers and its Board of Directors (the "Board"). With Defendants at the helm, Amedisys has taken advantage of the Medicare and Medicaid system by ensuring that its health providers visited patients a sufficient amount of times to trigger the additional payments.

4.     *The Wall Street Journal* revealed this scheme on April 27, 2010. It reported that Amedisys was taking advantage of the Medicare reimbursement system. According to a former Amedisys nurse quoted by *The Wall Street Journal,* she "was told 'we have to have ten visits to get paid.'" In addition, the former Amedisys employee said that her supervisors told her to look through patients' files to find those who were just shy of the 10-visit mark and call their assigned therapists to remind them to make the extra appointment. According to the former employee,

"The tenth visit was not always medically necessary."

5.	This story ignited anger from politicians, taxpayers and shareholders. The federal agency that advises Congress on Medicare payment issues, the Medicare Payment Advisory Commission, or MedPAC, warned that home health "overpayments contribute to the insolvency" of the Medicare trust fund as well as premium increases that beneficiaries must pay. The U.S. Senate Finance Committee sent a letter dated May 12, 2010, to Amedisys requesting that it produce documents concerning data on therapy visiting, lists of physicians with the highest patient referrals to the Company, and copies of all marketing material going back as far as 2006. Then, on June 30, 2010, the Company announced that it received a notice that the U.S. Securities and Exchange Commission ("SEC") launched a formal investigation of Amedisys and requested the same documents that the Company provided to the Senate Finance Committee.

6.	As revelation of the improprieties at the Company became public, Amedisys's market capitalization plummeted by $657.9 million from its high on April 14, 2010, approximately 37%. At least one investor has now filed a class action for securities fraud against the Company and certain of its officers. Then, on July 13, 2010, the Company said it would see a surprise drop in earnings in the second quarter. The stock tumbled 23% in one day.

7.	The actions taken by the Company's employees to increase the number of visits to meet Medicare benchmarks were expressly or implicitly approved by management and the Board of Amedisys. The scheme detailed above was widespread, prevalent, and continued for at least four years. In addition to the damage already caused, the liability the Company faces is substantial. For instance, violations of the False Claims Act ("FCA") can lead to the exclusion of the Company from Medicare and Medicaid programs. Since 90% of the Company's revenues come from Medicare, an exclusion that could ruin Amedisys.

8.	Plaintiff now brings this litigation on behalf of the Company and seeks to rectify the conduct of the individuals bearing ultimate responsibility for the corporation's misconduct— the directors of the Board and senior management—to impose responsibility upon those individuals and to recover for damages sustained by Amedisys due to defendants' gross

-2-

mismanagement of the Company and waste of Company assets.

## JURISDICTION AND VENUE

9.     Jurisdiction is conferred by 28 U.S.C. §1332. Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

11.    Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) because: (1) Amedisys maintains its principal place of business in this District; (2) one or more of the defendants either resides in or maintains executive offices in this District; (3) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Amedisys, occurred in this District; and (4) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

12.    Plaintiff Paula Wendland was a shareholder of Amedisys at the time of the wrongdoing complained of, has continuously been a shareholder since that time and is a current shareholder. Plaintiff is a citizen of Ontario, Canada.

**Nominal Defendant**

13.    Nominal defendant Amedisys is a Delaware corporation with its principal executive offices located at 5959 S. Sherwood Forest Blvd., Baton Rouge, LA. Amedisys is named in this complaint as a nominal defendant solely in a derivative capacity, and this

- 3 -

shareholder derivative action is on its behalf.

**Defendants**

14.     Defendant William F. Borne ("Borne") is Amedisys's Chairman of the Board and Chief Executive Officer and has been since he founded the Company in 1982, Chief Financial Officer from 1990 to 1996 and Vice President from 1990 to 1995. Defendant Borne knowingly or recklessly failed to maintain adequate internal controls with respect to Amedisys's financial reporting and Medicare billing practices. Borne made improper statements to the Company's shareholders. Further, Borne either knowingly, recklessly, or grossly negligently approved or allowed the improper manipulations of the Company's Medicare billing practices by causing Amedisys's employees to visit patients more than medically necessary. Defendant Borne is a citizen of Louisiana.

15.     Defendant Dale E. Redman ("Redman") is Amedisys's Chief Financial Officer and has been since February 2007. Defendant Redman knowingly or recklessly failed to maintain adequate internal controls with respect to Amedisys's financial reporting and Medicare billing practices. Redman made improper statements to the Company's shareholders. Further, Redman either knowingly, recklessly, or grossly negligently approved or allowed the improper manipulations of the Company's Medicare billing practices by causing Amedisys's employees to visit patients more than medically necessary. Defendant Redman is a citizen of Louisiana.

16.     Defendant Jeffrey D. Jeter ("Jeter") is Amedisys's Chief Compliance Officer and has been since March 2004. Jeter was also Amedisys's Vice President of Compliance/Corporate Counsel from April 2001 to March 2004. Defendant Jeter knowingly or recklessly failed to maintain adequate internal controls with respect to Amedisys's financial reporting and Medicare billing practices. Further, Jeter either knowingly, recklessly, or grossly negligently approved or allowed the improper manipulations of the Company's Medicare billing practices by causing Amedisys's employees to visit patients more than medically necessary. Defendant Jeter is a citizen of Louisiana.

17.     Defendant Ronald A. LaBorde ("LaBorde") is Amedisys's Lead Director and has

been since February 2003 and a director and has been since 1997. LaBorde is also a member of the Audit Committee and has been since at least May 2005. Defendant LaBorde knowingly or recklessly: (1) failed to maintain adequate internal controls with respect to Amedisys's financial reporting and Medicare billing practices; and (2) reviewed and approved improper public statements to Amedisys's shareholders. Further, LaBorde either knowingly or recklessly approved or allowed the improper manipulations of the Company's Medicare billing practices by causing Amedisys's employees to visit patients more than medically necessary. Defendant LaBorde is a citizen of Louisiana.

18.     Defendant Jake L. Netterville ("Netterville") is an Amedisys director and has been since 1997. Netterville is also Chairman of the Audit Committee and has been since February 2003 . Defendant Netterville knowingly or recklessly: (1) failed to maintain adequate internal controls with respect to Amedisys's financial reporting and Medicare billing practices; and (2) reviewed and approved improper public statements to Amedisys's shareholders. Further, Netterville either knowingly or recklessly approved or allowed the improper manipulations of the Company's Medicare billing practices by causing Amedisys's employees to visit patients more than medically necessary. Defendant Netterville is a citizen of Louisiana.

19.     Defendant David R. Pitts ("Pitts") is an Amedisys director and has been since 1997. Pitts is also a member of the Audit Committee and has been since at least May 2005. Defendant Pitts knowingly or recklessly: (1) failed to maintain adequate internal controls with respect to Amedisys's financial reporting and Medicare billing practices; and (2) reviewed and approved improper public statements to Amedisys's shareholders. Further, Pitts either knowingly or recklessly approved or allowed the improper manipulations of the Company's Medicare billing practices by causing Amedisys's employees to visit patients more than medically necessary. Defendant Pitts is a citizen of Louisiana.

20.     Defendant Peter F. Ricchiuti ("Ricchiuti") is an Amedisys director and has been since 1997. Ricchiuti is also a member of the Audit Committee and has been since at least May 2005. Defendant Ricchiuti knowingly or recklessly: (1) failed to maintain adequate internal

-5-

controls with respect to Amedisys's financial reporting and Medicare billing practices; and (2) reviewed and approved improper public statements to Amedisys's shareholders. Further, Ricchiuti either knowingly or recklessly approved or allowed the improper manipulations of the Company's Medicare billing practices by causing Amedisys's employees to visit patients more than medically necessary. Defendant Ricchiuti is a citizen of Louisiana.

21. Defendant Donald A. Washburn ("Washburn") is an Amedisys director and has been since 2004. Washburn is also a member of the Audit Committee and has been since at least May 2005. Defendant Washburn knowingly or recklessly: (1) failed to maintain adequate internal controls with respect to Amedisys's financial reporting and Medicare billing practices; and (2) reviewed and approved improper public statements to Amedisys's shareholders. Further, Washburn either knowingly or recklessly approved or allowed the improper manipulations of the Company's Medicare billing practices by causing Amedisys's employees to visit patients more than medically necessary. Defendant Washburn is a citizen of Oregon.

22. The defendants indentified in ¶¶14-16 are referred to as the "Officer Defendants." The defendants identified in ¶¶17-21 are referred to as the "Audit Committee Defendants." The defendants identified in ¶14, 17-21 are referred to as the "Director Defendants." Collectively, the defendants identified in ¶¶14-21 are referred to as the "Individual Defendants."

## DUTIES OF AMEDISYS'S DIRECTORS AND OFFICERS

**Fiduciary Duties**

23. By reason of their positions as officers, directors, and/or fiduciaries of Amedisys and because of their ability to control the business and corporate affairs of Amedisys, the Individual Defendants owed and owe Amedisys and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Amedisys in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Amedisys and its shareholders so to benefit all shareholders equally and not in furtherance of their personal, interest or benefit.

24.     Each director and officer of the Company owes to Amedisys and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

25.     The Audit Committee charter, in effect since July 2005 and substantially the same as amended in December 2008, states that the Audit Committee's purpose is to "oversee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company." Further, in order to carry out its stated purpose, the Audit Committee is responsible for discussing "major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies" and "to inquire of the Company's chief executive officer and chief financial officer as to the existence of any significant deficiencies or material weaknesses in the design or operation of internal control over financial reporting that are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information, and as to the existence of any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control over financial reporting." Additionally, the Audit Committee must "discuss and review the type and presentation of information to be included in earnings press releases" and "the types of financial information and earnings guidance provided, and the types of presentations made, to analysts and rating agencies."

26.     The Company also has a Code of Ethical Business Conduct (the "Code"). The Code states that "every director, officer and employee of the Company is expected to understand and follow the policies and guidelines outlined in this Code." The Code continues: "Amedisys is serious about ethical conduct and complying with all laws that affect our business. We will not

take actions that undermine our ethical principles or violate legal requirements." The Code points out that "if investors believe that the price of our Company's stock or other securities is subject to unfair manipulation by the Company or its officers, employees or directors, they will lose faith in us." Concerning billing, the Code states:

## V. BILLING

Amedisys officers and employees who are involved in the billing and collection function arc expected to understand and comply with all billing-related policies and procedures established by the Company, as well as applicable requirements of third-party payers (including Medicare and Medicaid) to which home healthcare service and product claims are submitted.

*Amedisys shall bill only for goods and services that are properly ordered and delivered or performed, as appropriate, In no event shall the Company bill for equipment beyond the date it is provided, and Amedisys should only bill for goods and services for which appropriate documentation exists.*

All coding of services must conform to applicable government regulations and commercial payor instructions. All required billing information (including diagnosis coding) must be collected and recorded accurately. All contact with customers to. obtain missing information must be properly documented.

Amedisys directors, officers and employees are expected to cooperate fully with all internal and external audits of the Company's billing system.

If you discover any coding error in the billing system, the mailer should be brought to the attention of your supervisor so that he or she may determine the nature and magnitude of the problem and the appropriate corrective action. The Company's policy is to refund any overpayments received as a result of coding errors and to notify the appropriate carrier or commercial payor of the problem. All such matters should also be brought to the attention of your Director of Operations and, in the case of government billings, to the attention of the Chief Compliance Officer.

Amedisys may not routinely waive or write off co-payments and deductibles for services rendered. Such a practice could cause the Company to violate its contractual obligations to carriers as well as certain governmental regulations.

You should consult the Company's Billing Department and Finance Department for questions pertaining to government billing and commercial billing.

**Control, Access, and Authority**

27.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Amedisys, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

28.    Because of their advisory, executive, managerial, and directorial positions with Amedisys, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and growth prospects of Amedisys. While in possession of this material, non-public information, the Individual Defendants made improper representations regarding the Company, including information regarding Amedisys'sfinancial results.

29.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Amedisys, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

30.    To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)    exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b)    exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations, and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c)    when put on notice of problems with the Company's business practices

and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence;

(d) properly and accurately guide investors and analysts to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial health; and

(e) remain informed how Amedisys conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws.

**Breaches of Duties**

31. Each Individual Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duty of loyalty, good faith, and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Amedisys, the absence of good faith on their part, and a knowing or willful disregard for their duties to the Company and its shareholders that the Individual Defendants were aware posed a risk of serious injury to the Company.

32. The Individual Defendants breached their duty of loyalty by allowing Individual Defendants to cause, or by themselves causing, the Company to engaged in the manipulation of care for its patients and misrepresent its financial condition and results. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions. Because of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject to investigations by the Senate Finance Committee and the SEC, and a class action lawsuit that alleges violations of securities laws. Thus, Amedisys has expended, and continues to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

33.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

34.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (1) conceal the fact that the Company was engaging in a scheme to manipulate the amount of times its employees visited patients in order to maximize the amount it received from Medicare; (2) enhance the Individual Defendants' executive and directorial positions at Amedisys and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions; and (3) deceive the investing public, including shareholders of Amedisys, regarding the Individual Defendants' management of Amedisys's operations, the Company's financial health and stability, and its future business prospects that had been misrepresented by Individual Defendants. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

35.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused the Company to issue improper financial statements.

36.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

37.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release

improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

38. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## BACKGROUND INFORMATION

### Amedisys's Business Model

39. Amedisys delivers care to its patients through its home health and hospice segments. According to the Company's Form 10-K filed on February 23, 2010, its "typical home health patient is Medicare eligible, approximately 83 years old, takes approximately 12 different medications on a daily basis and has co-morbidities. Amedisys relies on Medicare payments for its continued financial health. Medicare accounted for approximately 88%, 87%, 89%, 93% of the Company's net service revenue in 2009, 2008, 2007, and 2006, respectively.

40. Between 2000 and 2007, home health agencies ("HHAs") such as Amedisys, received a flat fee of $2,200 for up to nine home therapy visits. Medicare paid an additional reimbursement of $2,200 when a HHA made over nine therapy visits. The tenth visit is highly profitable to the Company because it costs Amedisys less than $80 per visit. Beginning in January 2008, CMS eliminated the $2,200 additional payment at 10 visits and now provides additional payments at six, fourteen, and twenty therapy visits.

### False Claims Act

41. Under the FCA, knowingly presenting or causing to be presented to the United States any false of fraudulent claim for payment is a violation of federal law. Knowingly includes making, using, or causing to be used or made, a false record or statement to get a false or fraudulent claim paid or approved by the government. "Claim" includes any request or

demand, whether under contract or otherwise, for money or property which is made to a contractor grantee or other recipient if the United States government provides any portion of the money or property which is requested or demanded, or if the government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested. The United States may recover for a violation of the FCA three times the amount of the damage the government sustained and a civil monetary penalty.

42.     In addition, a violation of the FCA can subject the perpetrator to exclusion from participation in federal health care programs. Such exclusion would result in catastrophic damages to the Company and its shareholders because Medicaid and Medicare would no longer cover the costs of a visit from an Amedisys employee. Without Medicaid or Medicare coverage most patients would not use the Company. As a result, the source of 90% of the Company's revenues would dry up. By engaging in the activity described herein, the Individual Defendants ran the risk that the Company would violate the FCA, and thus, be excluded from Medicare payments.

**Amedisys's Previous Violations of the FCA and Corporate Integrity Agreements**

43.     In 2003, the Company entered into a Corporate Integrity Agreement with the Office of the Inspector General of the Department of Health and Human Services ("OIG") concerning Amedisys's violations from 1994 to 1999 of the FCA (the "2003 CIA"). During that time period, the Company billed Medicare for services that were not rendered and submitted invalid cost report deductions. The Company's employees altered records, falsified physician/patient signatures, and falsified nurse's notes in order to bill for services that never occurred.

44.     The 2003 CIA mandated that the Company create a position for a Corporate Compliance Officer and a compliance committee. The Corporate Compliance Officer was responsible for developing and implementing policies, procedures and practices designed to ensure compliance with federal health care program requirements. The 2003 CIA also required that the Company maintain its written standards of conduct. Also in connection with these

- 13 -

violations, Amedisys agreed to pay the United State Department of Justice $1.156 million.

45.    On October 1, 2008, the Company acquired Home Health Corporation of America ("HHCA"). HHCA entered into a Corporate Integrity Agreement in 2005 ("2005 CIA") to resolve claims out of an illegal kickback scheme dating from February 1997 through May 1998. Though the wrongdoing at HHCA occurred before the Company acquired it, the provisions of the 2005 CIA are still binding on Amedisys. The 2005 CIA required that the Compliance Officer make periodic (at least quarterly) reports regarding compliance matters directly to the Board, and is authorized to report to the Board at any time any noncompliance. The 2005 CIA has stipulated penalties for non-compliance, including the possibility of exclusion from Medicare.

## DEFENDANTS' BREACHES OF FIDUCIARY DUTY

**Defendants' Illegal Scheme**

46.    The Individual Defendants either knowingly, or in reckless disregard of their duties, allowed the Company to engage in a scheme whereby Amedisys's employees would visit patients more than medically necessary in order to meet certain Medicare bench marks that would entitle the Company to additional fees.

47.    The statistical evidence of this improper scheme is overwhelming. According to *The Wall Street Journal,* between 2005 and 2007 only 2.88% of Amedisys's patients received nine visits. In comparison, over 9.5% of the Company's patients received ten visits, over three times more than those receiving nine visits.

48.    As stated above, CMS changed the reimbursement structure under PPS in 2008. After the change in billing in 2008, the amount of Amedisys patients receiving ten visits dropped by 50%. The percentage of the Company's patients that got six visits increased 8%. The percentage of patients getting fourteen visits rose 33% and the percentage getting twenty visits increased 41 %.

49.    Tracy Trusler, a former Amedisys nurse for two years, corroborated the existence of the scheme to *The Wall Street Journal.* She explained that "I was told 'we have to have ten visits to get paid.'" Ms. Trusler also stated that "[t]he tenth visit is not always medically

necessary." Instead, she stated that her supervisors instructed her to look through patients' files to find those who were just shy of ten visits and call their assigned therapists to remind them to schedule an additional appointment.

**Defendants' Improper Statements**

50.     On February 23, 2010, the Company issued a press release announcing its financial results for the fourth quarter and year ended December 31, 2009. The Company reported net service revenue of $405.5 million compared to $340.1 million in the fourth quarter of 2008.: The Company further reported net income of $37.8 million, or $1.35 diluted earnings per share for the quarter, compared to $26.3 million, or $0.97 diluted earnings per share in the same period of the prior year. For the year, the Company reported net service revenue of $1.5 billion, compared to $1.2 billion in 2008. The Company further reported net income of $135.8 million for 2009, compared to $86.7 million in 2008. The press release quoted defendant Borne's comments on the results, stating:

> "We had outstanding results for the fourth quarter and full year ending 2009. This marks the seventh consecutive year in which we have increased our earnings per share in excess of 20%."

51.     Also, on February 23, 2010, the Company filed its annual report for the fourth quarter and year ended December 31, 2009 with the SEC on a Form 10-K which was signed by defendants Borne, Redman, Netterville, Pitts, Ricchiuti, LaBorde, and Washburn. In addition, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), the Form 10-K contained signed certifications by defendants Borne and Redman, stating that the Form 10-K "did not contain any untrue statement of a material fact or omit to stale a material fact necessary to make the statements made." The Form 10-K acknowledged that the Company received the majority of its revenue from Medicare. In addition, it stated that the Company must comply with the "conditions of participation" including compliance with state and local laws and regulations. In particular, the Form 10-K stated:

> Medicare Participation

As we expect to continue to receive the majority of our revenue from serving Medicare beneficiaries, our agencies must comply with regulations promulgated by the United States Department of Health and Human Services in order to participate in the Medicare program and receive Medicare payments. Among other things, these regulations, known as "conditions of participation," relate to the type of facility, its personnel and its standards of medical care, as well as its compliance with state and local laws and regulations.

52.      Further, the Form 10-K also detailed the supposed internal controls that the

Company had in place. In particular, it stated:

**Controls over Our Business System Infrastructure**

We establish and maintain processes and controls over coding, clinical operations, billing, patient recertifications and compliance to help monitor and promote compliance with Medicare requirements.

*** 

*Billing*—We maintain controls over our billing processes to help promote accurate and complete billing. In order to promote the accuracy and completeness of our billing, we have annual billing compliance testing; use formalized billing attestations; limit access to billing systems; use risk forecasting methodologies; perform direct line supervisor audits; hold weekly operational meetings; use automated daily billing operational indicators; and take prompt corrective action with employees who knowingly fail to follow our billing policies and procedures in accordance with a well publicized "Zero Tolerance Policy".

*Patient Recertification*—In order to be recertified for an additional episode of care, a patient must be diagnosed with a continuing medical need. This could take the form of a continuing skilled clinical need or could be caused by changes to the patient's medical regimen or by modified care protocols within the episode of care. As with the initial episode of care, a recertification requires approval of the patient's physician. Before any employee recommends recertification to a physician, we conduct an agency level, multidisciplinary care team conference. We also monitor centralized automated compliance recertification metrics to identify, monitor, and where appropriate audit, agencies that have relatively high recertification levels.

*Compliance*—The quality and reputation of our personnel and operations are critical to our success. We develop, implement and maintain ethics, compliance and quality improvement programs as a component of the centralized corporate services provided to our home health and hospice agencies. Our ethics and compliance program includes a Code of Ethical Business Conduct for our employees, officers, directors and affiliates and a process for reporting regulatory or ethical concerns to our Chief Compliance Officer through a confidential hotline. We promote a culture of compliance within our company through persistent messages from our senior leadership concerning the necessity of strict

compliance with legal requirements and company policies and procedures, and through publicizing and enforcing our Zero Tolerance Policy. We also employ a comprehensive compliance training program that includes: annual compliance testing; new hire compliance training; new acquisition compliance training; sales compliance training; new employee orientation compliance training; billing compliance training; and compliance presentations at all company functions.

## THE TRUTH IS REVEALED

53. On April 27, 2010, *The Wall Street Journal* published an article questioning whether Amedisys was improperly taking advantage of the Medicare reimbursement system by increasing the number of in-home therapy visits. The article disclosed the following in relevant part:

> Medicare reimbursements are determined in part by the number of at-home therapy visits each patient receives, with an extra fee kicking in as soon as a patient hits a certain number of visits. Between 2000 and 2007, Medicare paid companies a flat fee of about $2,200 for up to nine home therapy visits. It paid an additional reimbursement of roughly $2,200 if the therapy surpassed nine visits. That incentive was designed so that agencies didn't "stint" on therapy visits, says Laurence Wilson, the director of chronic-care policy group at the Centers for Medicare and Medicaid Services, the agency that runs Medicare.

> According to The Journal analysis, which was based on publicly available Medicare records, Amedisys provided many of its patients just enough therapy visits to trigger the extra $2,200 payment. In 2005, 2006 and 2007, very few Amedisys patients received nine therapy visits while a much higher percentage got 10 visits or more. In 2007, for instance, only 2.88% of patients got nine visits, while 9.53% of patients got 10 visits.

> "I was told 'we have to have ten visits to get paid," says Tracy Trusler, a former Amedisys nurse for two years in Tennessee, who has since left the company. Her supervisors, she says, asked her to look through patients' files to find those who were just shy of the 10-visit mark and call their assigned therapists to remind them to make the extra appointment.

> "The tenth visit was not always medically necessary," Ms. Trusler says.

> * * *

> The number of visits eligible for the extra reimbursement has a significant impact on home-health providers' receipts from Medicare and thus on overall revenue. While Amedisys doesn't break out the amount of revenue from the extra Medicare payment, the company says between 55% and 60% of its patients receive home therapy. In 2007, according The Journal's analysis, 28.5% of the patients who received therapy got 10 to 12 visits, thereby triggering the extra $2,200 Medicare

payment. Such cases are highly profitable because they cost the company less than $80 per visit.

Medicare reimbursements for the entire home health-care industry are coming under increased scrutiny. The federal agency that advises Congress on Medicare payment issues, the Medicare Payment Advisory Commission, or MedP AC, warned last month that home health "overpayments contribute to the insolvency" of the Medicare trust fund as well as premium increases that beneficiaries must pay.

Medicare changed its reimbursement rules in January 2008 in an attempt to blunt the incentive for home health-care visits it created. It eliminated the $2,200 bonus payment at 10 visits and now pays an extra fee of a couple of hundred dollars at six, 14 and 20 therapy visits. "What we felt we could do is try to create some better incentives in the system for providing the level of service that beneficiaries actually needed," says Mr. Wilson from Medicare.

It wasn't until the change was made that MedPAC noticed the questionable home visit patterns. In its March report, the agency said that the industry-wide percentage of therapy visits in the 10-to-13 range dropped by about a third after the policy change in 2008.

The pattern of clustered visits around reimbursement target" is continuing: MedPAC found the number of therapy visits numbering six, 14 and 20 increased after the policy was changed in 2008.

During a MedPAC meeting in December, Arnold Milstein, a MedPAC commissioner, questioned whether all the home visits were appropriate. "Looking at the great speed with which the volume of services adapts to payment changes, which are breathtaking, it does suggest that there may be a problem with certifying the appropriateness of these services," Mr. Milstein said, according to a transcript of the meeting.

Based on the report, MedP AC suggested for the first lime last month that the Secretary of Health and Human Services "review borne health agencies that exhibit unusual patterns of claims for payment"

The Journal analysis found a similar pattern: In 2008, the percentage of Amedisys patients getting 10 visits dropped by 50%, while the percentage that got six visits increased 8%. The percentage of patients getting 14 visits rose 33% and tile percentage getting 20 visits increased 41 %.

\* \* \*

In 2000, Medicare rolled on its new reimbursement system. It began paying a flat sum of about $2,200 for a 60-day period of care, no matter how many limes a

Case 3:10-cv-00468-BAJ-CN   Document 1   07/15/10   Page 19 of 32

nurse went to a patient's home. The fee also included up to nine visits from occupational, physical or speech therapists. Doctors need to sign off on the number of visits in order for the company to be reimbursed.

Through 2007, an agency would receive the additional $2,200 if it sent a therapist to a patient's home 10 or more times during the same period.

The generous Medicare reimbursements are one reason the home health-care industry has grown so swiftly, according to MedPAC. There are now more than 1 0,400 home-health agencies in the U.S., up nearly 50% since 2002.

After the new reimbursement system was implemented in 2000, Amedisys's fortunes improved markedly. Its profits rose and its stock soared. Today, Amedisys has a market value of $1.7 billion.

54.    Following *The Wall Street Journal* article, the Senate Finance Committee started an investigation into Amedisys's billing and operating practices. In a letter to Amedisys dated May 12, 2010, the Senate Finance Committee cited to the article and questioned whether Amedisys "intentionally increased utilization for the purpose of triggering higher reimbursements." The letter stated that the findings reported in the article suggest that Amedisys is "basing the number of therapy visits they provide on how much Medicare will pay them instead of what is in the best interests of patients." Moreover, the Senate Finance Committee's letter noted that when Medicare changed its payment rules in 2008 to provide additional reimbursement to patients when they had six, fourteen, and twenty therapy visits, Amedisys "apparently changed their utilization patterns as a result of these payment policy changes." In addition, the Senate Finance Committee noted that the physician referral form associated with Amedisys's Balanced for Life program "raises concerns that the program may be taking advantage of Medicare payments in order to improve company profits." They also questioned marketing materials that aim to target seniors "to take advantage of Medicare payments to improve profits." Accordingly, the Senate Finance Committee requested that Amedisys produce a variety of documents.

55.    The next day, *The Wall Street Journal* reported that the Senate Finance Committee launched an investigation into the practices of Amedisys and whether the Company

has "deliberately boosted the number of home therapy visits to trigger higher Medicare reimbursements. The article stated in relevant part the following:

> Companies "working with Medicare should not be allowed to target seniors or manipulate care simply to get higher reimbursement rates," said Sen. Max Baucus (D. Mont.), chairman of the finance committee, in a statement.
>
> "It appears that either the home health care reimbursement policy is flawed, some companies are gaming the system, or both," said Sen. Charles Grassley, (R. Iowa), ranking member of the committee, "We're working to figure out what's going on."
>
>           *   *   *
>
> The senators asked Amedisys to also provide information on its falls-prevention program called "Balanced for Life."
>
> More than 330 Amedisys locations offer "Balanced for Life" -for which Amedisys has told investors that it receives an extra $1,000 to $2,000 per patient-up from 33 locations in 2008.

56.     On July 1, 2010, the Company announced that it received a formal notice of investigation from the SEC. In addition, the Company received a subpoena from the SEC relating to the matter under review by the Senate Finance Committee.

## REASONS THE STATEMENTS WERE IMPROPER

57.     The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)     the Company's reported sales and earning growth numbers were materially impacted by the Company's scheme to improperly and unethically increase its billing;

(b)     the Company's fiduciaries were in violation of the Code; and

(c)     the Company lacked adequate internal controls.

## DAMAGES TO AMEDISYS CAUSED BY THE INDIVIDUAL DEFENDANTS

58.     As a result of the Individual Defendants' improprieties, Amedisys manipulated its employees visits to patients in order to take advantage of Medicare's reimbursement benchmarks and disseminated improper financial statements. These improper statements and practices have

devastated Amedisys's credibility as reflected by the $657.9 million, or 37%, market capitalization loss.

59. Further, as a direct and proximate result of the Individual Defendants' actions, Amedisys has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a) costs incurred from responding to the Senate Finance Committee's requests for documentation;

(b) costs incurred from responding and defending itself in the SEC's investigation;

(c) costs incurred from defending and paying any settlement in the class action for violations of federal securities laws; and

(d) costs incurred from compensation and benefits paid to the defendants who have breached their duties to Amedisys.

60. Moreover, these actions have irreparably damaged Amedisys's corporate image and goodwill. For the foreseeable future, Amedisys will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that Amedisys's ability to raise equity capital or debt on favorable terms in the future is now impaired.

### DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

61. Plaintiff brings this action derivatively in the right and for the benefit of Amedisys to redress injuries suffered, and to be suffered, by Amedisys as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Amedisys is named as a nominal defendant solely in a derivative capacity. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

62. Plaintiff will adequately and fairly represent the interests of Amedisys in enforcing and prosecuting its rights.

63.     Plaintiff is a shareholder of the Company. Plaintiff was a shareholder of the Company at the time of the wrong complained of, has continuously been a shareholder since that time and is a current shareholder.

64.     The current Board of Amedisys consists of the following six individuals: defendants Borne, LaBorde, Netterville, Pitts, Ricchiuti, and Washburn.

65.     Plaintiff has not made a pre-suit demand on the Amedisys Board to bring these derivative claims because such demand would be a futile and useless act, and therefore, is legally excused.

## A.     Demand Is Excused Because the Director Defendants' Conduct Is Not a Valid Exercise of Business Judgment

66.     The Director Defendants' challenged misconduct at the heart of this case constitutes the direct facilitation of improper and unethical conduct, including knowingly and consciously presiding over the Company's systematic manipulations of the Company's billing practices, as well as actively covering up this misconduct through certain of the Director Defendants' participation in making misleading statements and assurances. As the ultimate decision-making body of the Company, the Board affirmatively adopted, implemented, and condoned a business strategy based on deliberate and widespread violations of applicable law. Breaking the law is not a legally protected business decision and such conduct can in no way be considered a valid exercise of business judgment. Accordingly, demand on the Board is excused.

67.     A derivative claim to recoup damages for harm caused to the Company by unlawful activity represents a challenge to conduct that is outside the scope of the Board's business judgment--conduct for which the Director Defendants face potential personal liability. Simply put, violating the law, approving the violations of applicable law by others, or looking the other way while refusing to prevent others under the Board's control from violating the law are all forms of misconduct that cannot under any circumstances be examples of legitimate business conduct. The protections of the "business judgment rule" do not extend to such malfeasance. Nor can such malfeasance ever constitute the "good faith" required of corporate

fiduciaries.

68. Significantly, Amedisys's unique history of non-compliance with the FCA, plus its dependence on Medicare for continued survival, quarterly Board meetings with the Compliance Officer, and imposition of corporate integrity agreements renders it impossible for the Board to claim ignorance of its duties to ensure that the Company operates its business lawfully and ethically. The Company's CEO and Chairman of the Board, defendant Borne, and its Corporate Counsel, defendant Jeter signed the 2003 CIA. Every member of the Board except Washburn was also on the Board at the time the Company, Borne, and Jeter entered into the 2003 CIA. Each Board member also signed at least one of the Company's annual reports that contained misleading public statements. The Board members knew of the importance of the Company's compliance with FCA and its relationship with the regulatory agencies administering Medicare. Each Director Defendant was also on the Board in 2008 when the Company acquired HHCA, which entered into the 2005 CIA. Therefore, each member of the Board knew or was reckless in not knowing about the Company's requirement not to manipulate its billing practices. The manipulation of the Company's billing practices became particularly apparent to insiders after the CMS changed how it provided additional payments to HHAs. In response, the Company's employees' visitation of patients changed dramatically to meet these new benchmarks. The Board's tacit or express approval for the continued manipulation of the visits to the Company's patients in order to increase billings to Medicare cannot be regarded as a valid exercise of business judgment.

**B. Demand Is Excused Because a Majority of the Board Faces a Substantial Likelihood of Liability**

69. Even if knowingly presiding over multiple violations of applicable law could somehow fall within the ambit of the business judgment rule (which it does not), demand is also futile and excused because a majority of the Board is not disinterested.

70. Defendants LaBorde, Netterville, Pitts, Ricchiuti, and Washburn cannot impartially consider a demand because they face a substantial likelihood of liability. Each of

these directors were members of the Audit Committee, which requires them to "oversee the accounting and financial reporting processes of the Company" and must discuss "major issues as to the adequacy of the Company's internal controls." Additionally, LaBorde, Netterville, Pitts, Ricchiuti, Washburn must "discuss and review the type and presentation of information to be included in earnings press releases" and "the types of financial information and earnings guidance provided, and the types of presentations made, to analysts and rating agencies." Thus, defendants LaBorde, Netterville, Pitts, Ricchiuti, and Washburn were responsible for overseeing and directly participating in the dissemination of Amedisys'simproper financial statements. Even worse, defendants LaBorde, Netterville, Pitts, Ricchiuti, and Washburn approved the dissemination of the improper press releases and financial statements filed with the SEC, including the improper Form 10-K which they signed, as alleged above. Defendants LaBorde, Netterville, Pitts, Ricchiuti, and Washburn breached their fiduciary duty of loyalty by participating in the preparation and approving improper public statements

71.    Further Borne, LaBorde, Netterville, Pitts, and Ricchiuti have all been on the Board since 1997, and thus were on the Board when the Company violated the FCA, which led to the 2003 CIA. Borne, LaBorde, Netterville, Pitts, Ricchiuti, and Washburn were on the Board when the Company bought HHCA, which subjected the Company to the 2005 CIA. Pursuant to the 2005 CIA, the Board met at least quarterly with the Compliance Officer. The Company's manipulation of its billing practices was systemic throughout the Company, lasted at least four years, and possibly subjected the Company to exclusion from Medicare, the Company's major source of income. Despite the red flags alerting them to the Company's need for adequate internal controls over its billing practices and the importance of continued involvement of Medicare to the Company, Borne, LaBorde, Netterville, Pitts, Ricchiuti, and Washburn either approve, or in reckless disregard of their duties, were unaware of the manipulation occurring at Amedisys concerning its billing practices through unnecessary visitations. In light of the above, the only way the members of the Board could not have known about the Company's illegal and unethical practices was through conscious disregard of their duty of loyalty. Therefore, Borne,

LaBorde, Netterville, Pitts, Ricchiuti, and Washburn face a substantial likelihood of liability, excusing a demand.

72.    Defendant Borne founded the Company and is its CEO and Chairman. On November 10, 2003, Borne entered into the 2003 CIA. Borne was also CEO when Amedisys acquired HHCA, and correspondingly Amedisys became subject to the 2005 CIA. Borne also made and signed misleading public statements, as explained herein. Further, as CEO of the Company, Borne runs the daily operations of Amedisys. Therefore, he is responsible for the Company's lack of adequate internal controls, violations of applicable law, and violations of the consent decree. Therefore, Borne faces a substantial likelihood of liability, raising a reasonable doubt about whether he could impartially consider a demand.

73.    The Director Defendants were, moreover, required to act upon this information to protect the Company from continued legal violations being committed in its names. Rather than doing so, these defendants, in violation of their legal obligations, consciously ignored the information presented to them and about which they were otherwise made aware concerning the Company's extensive legal and ethical violations. As a result, the members of the Board face a substantial likelihood of liability for their conduct and demand is, therefore, excused.

74.    The Director Defendants are likewise conflicted from and unable to pursue the Company's claims against the Officer Defendants. Any effort to directly prosecute such claims against the Officer Defendants for their direct roles in the violations of applicable law carried out in Amedisys's name would necessarily expose the Board's own culpability for the very same conduct. In other words, given that the Board was required to be regularly informed concerning the Company's compliance or non-compliance with applicable laws, any effort by the Director Defendants to hold the Officer Defendants liable would lead the Officer Defendants to defend on the ground that their own conduct was consistent with corporate policy and practice, as established and by and known to the Board.

75.    The acts complained of constitute violations of the fiduciary duties owed by Amedisys's officers and directors and these acts are incapable of ratification.

76. Each of the defendant directors of Amedisys authorized and/or permitted the improper statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the improper statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them.

77. Amedisys has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants, including the Director Defendants, have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Amedisys any part of the damages Amedisys suffered and will suffer thereby.

78. Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed to seek recovery for Amedisys for any of the wrongdoing alleged by plaintiff herein.

79. If Amedisys's current and past officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of Amedisys. But the directors' and officers' liability insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by Amedisys against these Individual Defendants, known as the "insured versus insured exclusion." As a result, if these directors were to cause Amedisys to sue themselves or certain of the officers of Amedisys, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If no directors' and officers' liability insurance exists, then the current directors will not cause Amedisys to sue the Individual

Defendants named herein, since they will face a large uninsured liability and lose the ability to recover for the Company from the insurance.

80.     Plaintiff has not made any demand on the shareholders of Amedisys to institute this action since such demand would be a futile and useless act for at least the following reasons:

(a)     Amedisys is a publicly held company with over 28 million shares outstanding and thousands of shareholders;

(b)     making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

(c)     making demand on all shareholders would force plaintiff to incur excessive expenses, assuming all shareholders could be individually identified.

## COUNT I

### For Breach of Fiduciary Duty Against the Individual Defendants

81.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

82.     As alleged in detail herein, the Individual Defendants, by reason of their positions as officers and directors of Amedisys and because of their ability to control the business and corporate affairs of Amedisys, owed Amedisys fiduciary obligations of due care and loyalty, and were and are required to use their utmost ability to control and manage Amedisys in a fair, just, honest, and equitable manner.

83.     Defendants Borne, Redman, and Jeter violated their fiduciary duties of loyalty and care by making improper statements and authorizing or permitting the Company's unethical and improper manipulation of its billing practices.

84.     The Audit Committee Defendants breached their fiduciary duties of loyalty by approving the improper statements and omissions as described herein. The Audit Committee Defendants also completely and utterly failed in their duties of oversight, including their duties of oversight of the financial and reporting process, and of reviewing earnings press releases and

Case 3:10-cv-00468-BAJ-CN   Document 1   07/15/10   Page 28 of 32

the steps management has taken to monitor and control this, as required by the Audit Committee Charter in effect at the time.

85.  All of the Director Defendants failed in their duties of oversight over the Company's financial and reporting process and breached their fiduciary duty of loyalty by failing to ensure that an adequate system of internal control was in place. Additionally, the Director Defendants approved or made improper statements in the Company's Form 10-K, as explained herein.

86.  But for the abdication of the Individual Defendants' fiduciary duties, the Company would not have been damaged. Accordingly, all of the Individual Defendants breached their fiduciary duties.

87.  As a direct and proximate result of Individual Defendants' failure to perform their fiduciary obligations, Amedisys has sustained significant damages, as alleged herein. As a result of the misconduct allege herein, these defendants are liable to the Company.

88.  Plaintiff, on behalf of Amedisys, has no adequate remedy at law.

## COUNT II

### For Waste of Corporate Assets Against the Individual Defendants

89.  Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

90.  As a result of the misconduct described above, the Individual Defendants wasted corporate assets: (1) by failing to maintain sufficient internal controls over the Company's reporting and billing process; (2) by failing to properly consider the interests of the Company and its public shareholders; (3) by failing to conduct proper supervision; (4) by paying undeserved incentive compensation to certain of its executive officers; and (5) by incurring potentially hundreds of millions of dollars in liability from the securities class action and investigations by the Senate Finance Committee and SEC.

91.  As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

92.     Plaintiff, on behalf of Amedisys, has no adequate remedy at law.

### COUNT III

### For Unjust Enrichment Against the Individual Defendants

93.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

94.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Amedisys.

95.     Plaintiff, as a shareholder and representative of Amedisys, seeks restitution from the Individual Defendants, each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendants, each of them, from their wrongful conduct and fiduciary breaches.

96.     Plaintiff, on behalf of Amedisys, has no adequate remedy at law.

### PRAYER FOR RELIEF

Plaintiff therefore requests, on behalf of Amedisys, judgment as follows:

A.     Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.     Directing Amedisys to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Amedisys and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.     a proposal to remove from the Board those members who have breached their fiduciary duties to Amedisys;

2.     a proposal to strengthen the Company's controls over financial reporting;

3.     a proposal to strengthen the Company's controls over its Medicare billings

Case 3:10-cv-00468-BAJ-CN   Document 1   07/15/10   Page 30 of 32

practices;

        4.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

        5.      a provision to permit the shareholders of Amedisys to nominate candidates for election to the Board; and

        6.      a proposal to strengthen Amedisys's oversight of its disclosure procedures;

      C.      Awarding to Amedisys restitution from the Individual Defendants, each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

      D.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

      E.      Granting such other and further relief as the Court deems proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: July 15, 2010                  LEMMON LAW FIRM, LLC
                                        ANDREW A. LEMMON

                                        s/ Andrew A. Lemmon
                                        ANDREW A. LEMMON (#18302)
                                        IRMA L. NETTING (#29362)
                                        15058 River Road
                                          P.O. Box 904
                                        Hahnville, Louisiana 70057
                                        Telephone: (985) 783-6789
                                        Facsimile: (985) 783-1333

                                        Charles W. Branham, III
                                        Hamilton Lindley
                                        GOLDFARB BRANHAM LLP
                                        2501 N. Harwood, Ste. 1801
                                        Dallas, TX 75201
                                        Telephone: (214) 583-2233
                                        Facsimile: (214) 583-2234

**VERIFICATION**

I, _Paula Wendland_, have read the Verified Shareholder Derivative Complaint and know the contents thereof. The complaint is true and correct to the best of my knowledge and belief. I declare under penalty of perjury the foregoing is true and correct.

Dated: _June 26, 2010_

Signature _P. Wendland_

Print Name: _Paula Wendland_